# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2490

_____

United States of America,       *
      *
       Appellee,       *
      *    Appeal from the United States
      v.       *    District Court for the
      *    District of North Dakota.
Russell Charles Seidel,       *
      *       [PUBLISHED]
       Appellant.       *

_____

Submitted: February 17, 2012
Filed: May 1, 2012

_____

Before RILEY, Chief Judge, WOLLMAN, and SMITH, Circuit Judges.

_____

PER CURIAM.

Russell Charles Seidel entered a conditional guilty plea to conspiracy to possess with intent to distribute and distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2. Seidel appeals, challenging the district court's[1] denial of his motion to suppress evidence obtained through a search warrant. Seidel argues that the warrant, based on a garbage pull conducted at his residence, was issued without probable cause. We affirm.

_____

[1]The Honorable Patrick A. Conmy, United States District Judge for the District of North Dakota.

## I. *Background*

On July 9, 2010, Burleigh County Sheriff's Deputy Nathan McLeish and Morton County Assistant State's Attorney Jackson Lofgren sought a warrant to search a residence and garage located at 410 Fourth Avenue Northeast in Mandan, North Dakota. They appeared before Judge Donald Jorgensen in Morton County District Court in Mandan, North Dakota. They were "seeking to search [the residence and garage] for controlled substances, drug paraphernalia, pay sheets, currency, cellular telephones, and any other indicia of drug traffic."

Deputy McLeish testified that on July 8, 2010, members of the Metro Area Narcotics Task Force were at 410 Fourth Avenue Northeast "conducting . . . a trash pull or a garbage pull." He explained that a "garbage pull" "is an investigatory tool that law enforcement uses to gather intelligence to be used later down the road, whether to be used for search warrants or to be used as intelligence." According to Deputy McLeish, early that morning, the task force officers pulled the trash for the residence at 410 Fourth Avenue Northeast, as the trash had been left out for collection. "[T]he trash was . . . curbside waiting for pickup the next morning." The officers only seized the trash and did not search it at that time. Deputy McLeish "went through the garbage that was seized" "at 8:00." Deputy McLeish testified that he found items in the garbage that "le[d] [him] to believe that there [were] controlled substances or drug paraphernalia located at that residence," stating:

> I noted that we found nine spiral bound notebook pieces of paper that had ledgers on; people's names at the top, also right behind that were large amounts of what appeared to be—what is my word—numbers behind them. Some say 6100 plus 3100 equals so much, and they would keep tacking on those numbers. One of those pieces of paper there was actually one quarter and one-half written right next to those amounts.

Based on his narcotics training, Deputy McLeish testified that "[t]hose numbers indicate to me that those are amounts used to keep track of how much drugs are being

sold and how much money is being brought in for those, what we refer to as pay-owe sheets." Deputy McLeish confirmed that those sheets are "basically a ledger of who this person is selling drugs to and what they are being paid." According to Deputy McLeish, he recovered drug paraphernalia from the trash, stating:

> We also found a used syringe in the trash. We weren't able to get anything from the syringe, but did notice that it was just open in the trash, which is uncommon. People who legitimately use needles carry sharps container and dispose of things like that normally.

> I also found a metal paper clip, the one end was turned out and I noticed there was a dark gooey substance on one end. I've seen this in my line of work. These are commonly used to clean out pipes, marijuana pipes, things like that. I took a sample of that brown gooey substance and used a narcotics test kit for marijuana, and it did field test positive for marijuana.

Deputy McLeish confirmed that "needles like [the one recovered from the trash are] commonly used by people who are using controlled substances." "Based on what [he] found in the trash there," Deputy McLeish concluded that "someone was using controlled substances at that residence and also selling them out of their residence." Deputy McLeish explained that he also had "[i]nformants and just people calling in saying that something suspicious was going on [at the residence]." "[B]ased on [the] trash pull," Deputy McLeish verified that "those anonymous tips appear[ed] to be corroborated." He also stated that "the things that are listed there on the search warrant, the controlled substances, the paraphernalia, the pay-owe sheets, currency, and the telephones, are . . . all items that would be expected to be found in that residence if someone were using and selling drugs out of the residence."

As to the "request to search the garage," Deputy McLeish testified that "[t]he garage [was] actually a detached portion of the house" that "face[d] just to the south of the residence." He confirmed that "trash coming out of the garage would probably

be in the trash can that was searched." He also confirmed that, based on "what [he had] seen, the drugs [were] likely in the residence or in the garage." That is why he wanted to search "both the house and the garage."

Deputy McLeish informed Judge Jorgensen that "the occupant of this residence" was "an individual named Russell Seidel." Although Deputy McLeish had no experience with Seidel, he explained that "the task force does have a case file on Mr. Seidel for drug history." Deputy McLeish stated that this was "an individual residence."

Based on this information, Judge Jorgensen "f[ound] . . . probable cause for the issuance of a warrant" and issued a search warrant for the premises.

On July 14, 2010, task force officers executed the search warrant. According to ¶ 9 of the presentence investigation report, officers seized the following evidence during the search of Seidel's residence:

> $43,675 in U.S. currency; 133.05 grams of methamphetamine (98.75% pure); 25.85 grams of cannabis; 2 LSD strips; 116 tablets of Alprazolam (Xanax); several vehicle titles; pay/owe sheets; syringes; ziploc baggies; pipes (both meth and marijuana); digital scale; tweezers; and snort tubes.

An arrest warrant was issued for Seidel. At the time of his arrest, Seidel possessed $17,150 in U.S. currency, methamphetamine, a digital scale, a snort tube, foil with residue, and two cell phones.

Seidel was indicted for conspiracy to possess with intent to distribute and distribute a controlled substance. Seidel moved to suppress the evidence, arguing that "there was insufficient evidence to establish probable cause for the issuance of a search warrant for the residence and garage in question." *United States v. Seidel*, No.

1:10-cr-071, 2010 WL 4065408, at *1 (D.N.D. Oct. 15, 2010) (slip copy). He "ask[ed] that the fruits of that search be suppressed." *Id*. The district court denied his motion, concluding that "[t]he recovery of drug paraphernalia from a garbage [can] left outside a residence contributes significantly to the establishment of probable cause." *Id*. at *2. The court found that "evidence of drug activity," which "included pay-owe sheets, a syringe, and a paper clip which tested positive for marijuana" "suggest[ed] criminal drug activity was occurring at the residence and is sufficient for a finding of probable cause." *Id*. In the alternative, the court determined that "[e]ven if probable cause did not exist for the issuance of the warrant, the good faith exception to the exclusionary rule as announced in *United States v. Leon*, 468 U.S. 897 (1993), would allow admission of the evidence." *Id*.

After the district court denied his motion, Seidel conditionally pleaded guilty to the charge. He reserved the right to appeal the court's denial of his motion to suppress evidence obtained pursuant to the search warrant. At sentencing, the district court sentenced Seidel to a mandatory term of life imprisonment.

## II. *Discussion*

Seidel asserts that the district court erroneously denied his motion to suppress evidence discovered in the search of 410 Fourth Avenue Northeast, Mandan, North Dakota. Seidel contends that the search warrant lacked probable cause. According to Seidel, items found during the garbage pull were insufficiently connected to the residence and did not demonstrate a fair probability that drug contraband would be found at the residence. He maintains that field-tested marijuana on a bent paper clip did not justify issuance of the warrant. Furthermore, he contends that Deputy McLeish's testimony that the torn notebook pages were pay-owe records was merely his own conjecture, with no supporting facts. Seidel argues that Deputy McLeish admitted that no information was derived from an uncased syringe found in the garbage; therefore, no basis existed to conclude that a fair probability existed that drug contraband would be found in the residence.

"To determine whether probable cause exists to support a search warrant we look at the 'totality of the circumstances.'" *United States v. Reinholz*, 245 F.3d 765, 776 (8th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 234 (1983)). "A warrant is supported by probable cause if there is a fair probability that contraband or evidence of a crime will be found in the place to be searched." *Id*. (quotation and citation omitted). "We assess probable cause from the viewpoint of a reasonably prudent police officer acting in the circumstances of the particular case." *Id*. (internal citations omitted). "[P]robable cause is a practical, factual, and nontechnical concept, dealing with probabilities." *Id*. "The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit." *United States v. Sumpter*, 669 F.2d 1215, 1218 (8th Cir. 1982) (quotation and citation omitted).

"Many of our cases recognize that the recovery of drugs or drug paraphernalia from the garbage contributes significantly to establishing probable cause." *United States v. Briscoe*, 317 F.3d 906, 908 (8th Cir. 2003) (citing *Reinholz*, 245 F.3d at 776 (brass pipe with cocaine residue and twenty syringes (four with methamphetamine residue) found in trash, coupled with occupant's prior drug conviction, established probable cause for search warrant); *United States v. Gonzalez–Rodriguez*, 239 F.3d 948, 950–51 (8th Cir. 2001) (crack pipe, baggies, and foil with methamphetamine residue found in trash, coupled with informant's tip, established probable cause for search warrant); *United States v. Hohn*, 8 F.3d 1301, 1302, 1306–07 (8th Cir.1993) (baggie and sno-seals with methamphetamine residue found in trash, coupled with informant's tip, established probable cause for search warrant); *Sumpter*, 669 F.2d at 1220–22 (baggie of marijuana found in trash, coupled with tips from informant, neighbor, and garbage collector, established probable cause for search warrant); *United States v. Biondich*, 652 F.2d 743, 744–46 (8th Cir. 1981) (baggie containing small amount of marijuana and folded paper containing traces of opiates found in trash, coupled with occupant's two prior drug convictions, established probable cause for search warrant); *United States v. Koons*, 300 F.3d 985, 988, 991–92 (8th Cir.

2002) (numerous marijuana stems found in trash, coupled with informant's tip, established police officer's good-faith belief that search warrant was supported by probable cause and validated search under *Leon*)). And, in fact, "our court appears close to a blanket exception holding that trash pulls, standing alone, provide probable cause for the issuance of a search warrant in all cases." *United States v. Timley*, 443 F.3d 615, 624 (8th Cir. 2006) (quotation, alteration, and citation omitted). For example, we have held that "there was probable cause for issuance of a warrant based solely on a trash pull that yielded forty marijuana seeds and twenty-five stems." *Id.* (citing *Briscoe*, 317 F.3d at 908).

In the present case, "[w]e have little hesitancy in concluding a reasonable magistrate would conclude the materials found in the trash . . . were sufficient to establish probable cause that [Seidel's residence and garage contained controlled substances, drug paraphernalia, pay sheets, currency, cellular telephones, and any other indicia of drug traffic]." *United States v. Allebach*, 526 F.3d 385, 387 (8th Cir. 2008) (holding that "two plastic bags with cocaine residue, two corners torn from plastic bags, Brillo pads, [and] a film canister with white residue . . . were sufficient to establish probable cause that cocaine was being possessed and consumed in [the defendant's] residence"). First, Deputy McLeish testified that members of the task force conducted the trash pull at 410 Fourth Avenue Northeast—Seidel's residence.[2] Second, Deputy McLeish testified that officers discovered in Seidel's trash "nine

---

[2]Although Deputy McLeish was not present at the residence during the trash pull, Deputy McLeish was not required to have "first-hand knowledge of every allegation" that he testified to in support of the search warrant. *Cf. United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) ("[T]here is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit.") (citing *United States v. Jones*, 471 F.3d 868, 874 (8th Cir. 2006) (affirming the validity of a warrant even though "a detective other than the affiant [was] the source of the information in the affidavit")).

spiral bound notebook pieces of paper that had ledgers on [them]"; based on his narcotics training, Deputy McLeish stated that those pieces of paper were "pay-owe sheets"—"basically a ledger of who this person is selling drugs to and what they are being paid." Third, Deputy McLeish testified that officers recovered a syringe not properly disposed of, which indicated to Deputy McLeish, based on his experience, that it was not being used for a legitimate purpose. Fourth, Deputy McLeish testified that the metal paper clip recovered from the trash testified positive for marijuana and that paper clips "are commonly used to clean out . . . marijuana pipes." As the district court correctly concluded, all of this "evidence suggests criminal drug activity was occurring at the residence and is sufficient for a finding of probable cause." *Seidel*, 2010 WL 4065408, at *2.

Finally, Seidel asserts that the district court should have granted his motion to suppress because Deputy McLeish did not prepare a written affidavit for Judge Jorgensen to review. According to Seidel, when a judge relies on an officer's oral testimony instead of a written affidavit, the judge has abandoned his proper role in assessing probable cause. In support of his argument, Seidel relies on the following passage from *Koons*:

> [The defendant] claims the issuing magistrate abandoned the role of a judge. That can happen if a magistrate fails to read a warrant application or affidavit, relies on an officer's oral testimony rather than the written affidavit, approves a warrant without specifics as to the objects of the search, fails to comply with legal formalities such as required signatures, or otherwise acts contrary to law.

300 F.3d at 992 (citing *United States v. Decker*, 956 F.2d 773, 777 (8th Cir. 1992)). In *Decker*, it was a *compilation* of the aforementioned facts that led us to conclude that "the district court did not clearly err in determining that the issuing judge failed to act in a detached and neutral manner." 956 F.2d at 777. "The district court [had] found that the issuing judge signed the warrant without reading it and that he failed

to note both that the prosecutor had not signed the warrant and that the warrant did not list the property to be seized." *Id.* (footnote omitted). We affirmed, explaining:

> The warrant's glaring omission of the items to be seized supports the district court's finding that the issuing judge never read it. The judge's failure to strike the words "unlawfully stolen" from the warrant further supports this conclusion. The same can be said regarding the judge's failure to ensure that the prosecutor had signed the warrant, as required by Missouri law. *See* note 5 *supra*. Moreover, the judge himself admitted that he issued "the search warrant on the strength of what the officer told me," as opposed to relying on the written warrant and affidavit.

*Id.*

In *Decker*, there was no indication that the officer was placed under oath prior to testifying in support of the search warrant. Nor is there any indication that the oral testimony was recorded. In the present case, Deputy McLeish was "duly sworn," and his oral testimony was recorded.

Aside from *Koons*, Seidel has not cited any state or federal law providing that Deputy McLeish had to provide a written affidavit in lieu of recorded, sworn oral testimony. We conclude that Deputy McLeish's recorded, sworn oral testimony was sufficient to support the issuance of the search warrant. *Cf.* Fed. R. Crim. P. 41(d)(2)(B)–(C)[3]; *United States v. Berkus*, 428 F.2d 1148, 1151 n.2 (8th Cir. 1970)

---

[3]Federal Rule of Criminal Procedure 41(d)(2)(B)–(C) provides:

(B) Warrant on Sworn Testimony. The judge may wholly or partially dispense with a written affidavit and base a warrant on sworn testimony if doing so is reasonable under the circumstances.

(C) Recording Testimony. Testimony taken in support of a warrant must

(applying Minnesota law and agreeing with a district court's observation that "'if there were no affidavit or application at all, [then] the oral testimony must be transcribed to substantiate or evidence the interview; however, if there is a reasonably adequate complaint itself in writing, then the oral testimony should be considered for its merit'").

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

be recorded by a court reporter or by a suitable recording device, and the judge must file the transcript or recording with the clerk, along with any affidavit.